UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

MICHAEL ADAM ARELLANO,   Case no. 16-12720 ta7

    Debtor.

CHARLES J. DAVIS,

    Plaintiff,

v.   Adv. No. 17-1006 t

MICHAEL ADAM ARELLANO,

    Defendant.

## **OPINION**

The Court tried this nondischargeability action on August 30, 2017, and took the matter under advisement. Having carefully reviewed the evidence and the law, the Court now holds that judgment should be entered against Plaintiff on his §§ 523(a)(4) and (a)(6)[1] claims. The Defendant's debt to Plaintiff is dischargeable.

### I.    FACTS

The Court makes the following findings of fact:

Defendant is an entrepreneur. In July 2011, he formed Tango, LLC, a New Mexico limited liability company (the "Company"). Defendant was the Company's sole member. The Company's proposed business was to own and operate a web-based "social media enterprise" designed to assist the Company's customers with sales and business development. The Company was capitalized initially by money from Defendant's prior business. Defendant deposited those funds

---

[1] Unless otherwise noted, all statutory references are to 11 U.S.C.

in a checking account opened in the Company's name (the "Company Account"). Defendant was the sole signatory on the Company Account.

Defendant knew when he started the Company that its platform required substantial development, and that he would need to raise a significant amount of capital to launch the business successfully.

In the fall of 2011, Defendant was introduced to George Lovato, Jr., a corporate finance consultant and the principal of B.H. Capital Limited. The two met in October 2011 to discuss and review the Company's business concept. On December 15, 2011, Defendant and B.H. Capital signed a Corporate Finance Consulting Agreement. Under the agreement, in consideration for a $20,000 consulting fee, B.H. Capital was to advise the Company in raising start-up capital.

After signing the agreement, Mr. Lovato gave Defendant a place to work, charging him $500 per month. From January through August of 2012, Mr. Lovato supervised Defendant's progress in developing the Company. During this period, Defendant assembled "wire frames" (analogous to blueprints, the Court understands) for the Company's online platform, worked on website design, and formulated revenue models. Mr. Lovato was pleased with the Company's development. He assumed an active role in the enterprise, becoming the treasurer and eventually the chairman of the board of directors.

As part of Mr. Lovato's plan to raise capital, he recommended in early 2012 that Defendant convert the Company to a New Mexico corporation. The necessary conversion documents were signed in February 2012, but the conversion to Tango, Incorporated, a New Mexico corporation (the "Corporation") did not occur until August 23, 2012.

At various times in 2012, Defendant approached friends and acquaintances about investing in the Corporation. Plaintiff was among the potential investors Defendant contacted. On August

6, 2012, Plaintiff gave Defendant a $15,000 cashier's check, payable to the order of Defendant. Defendant deposited the $15,000 into the Company Account.[2]

On August 7, 2012, Plaintiff and the Corporation (which had not yet been incorporated) signed a Pre-Incorporation Agreement. In this agreement the Corporation agreed to issue to Plaintiff 1.5% of its stock in return for the $15,000 investment.

The Corporation came into legal existence on August 23, 2012, when the New Mexico Public Regulation Commission issued a Certificate of Incorporation by Conversion. The certificate stated that the Company was converted to the Corporation on that date.

After conversion, the Corporation opened a bank account at Union Savings Bank (the "Corporation Account"). Defendant was not an authorized signer on the Corporation Account; if he wanted to pay a debt or an invoice of the Corporation with funds in the Corporation Account, he had to obtain approval (and a check) from Mr. Lovato, who had signing authority. The Company Account, into which Plaintiff's $15,000 investment had been deposited, remained open. No funds were transferred from the Company Account to the Corporation Account.

On October 17, 2012, Plaintiff delivered a $5,000 cashier's check to Defendant. The check was payable to the Corporation. Defendant deposited the check into the Corporation Account.

From late 2012 through early 2014, Defendant continued working on the Corporation's development and engaged a variety of engineers and consultants. Investors, including Plaintiff, were invited on occasion to attend live demonstrations of the Corporation's online platform and to give their feedback.

---

[2] As a side note, on August 7, 2012, Defendant signed a $15,000 promissory note in favor of Plaintiff. The parties testified that this note was a sort of back-up arrangement if Plaintiff's investment in Tango was lost for any reason.

On or about August 1, 2013, the Corporation issued 30,000 shares of common stock to Plaintiff.

No money was deposited into the Company Account after conversion, but Defendant retained authority to spend the funds in the account. Defendant used the money to pay Corporation expenses after the August 23, 2012 conversion. As time went on and Defendant's other sources of income diminished, he also used the Company Account (the amount is not in evidence) for personal expenses such as utility bills and food.

Plaintiff confronted Defendant in June 2014, asserting that Defendant had misused Plaintiff's investment money. The Corporation, which had never "gotten off the ground," ceased operations later that month.

On October 1, 2014, Defendant entered into a Repayment Agreement with three investors, including Plaintiff, to repay $50,000 in invested funds. In December 2014, the parties discussed amending the agreement to provide Defendant more flexibility in repaying the $50,000. The amendment was never finalized, and Defendant never repaid the entire $50,000. Of Plaintiff's $20,000 investment, Defendant repaid about $6,350.

Plaintiff sued Defendant in state court to recover the amount due. On August 24, 2016, the state court entered a money judgment against Defendant, in favor of Plaintiff, for $10,157. Post-judgment interest accrued at 8.75%.

## II. DISCUSSION

A. <u>Effect of Company's Conversion to Corporation</u>.

Under New Mexico law, "[a] limited liability company may be converted to a corporation, partnership or limited partnership." N.M.S.A. 1978, § 53-19-60.1. When such conversion takes effect "all property owned by the converting entity is vested in the converted entity," and "all

-4-

debts, liabilities and other obligations of the converting entity continue as obligations of the converted entity . . . ." N.M.S.A. § 53-19-61.

Based on the above-cited New Mexico statute, the Company Account became property of the Corporation on August 23, 2012, and remained Corporation property thereafter. Defendant's 2013 and/or 2014 personal expenses that Plaintiff complains about were paid with corporate assets, not with assets belonging to Plaintiff, Defendant, or the Company. This distinction is significant.

B.  § 523(a)(4) (Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement, or Larceny).

    1.  Elements of § 523(a)(4) claim. Plaintiff alleges that his claim is nondischargeable under § 523(a)(4), i.e., a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

        a.  Fraud or defalcation while acting in a fiduciary capacity. To be nondischargeable under this section, debts "for fraud or defalcation[3] while acting in a fiduciary capacity" must have been incurred with intentional wrongful conduct, bad faith, moral turpitude, or other immoral conduct. *Bullock v. Bankchampaign, N.A.*, 569 U.S. 267, 273-74 (2013).

        b.  Embezzlement. A creditor may prove embezzlement by showing: (1) his property was entrusted to the debtor; (2) the debtor appropriated the property for a use other than the use for which it was entrusted; and (3) the circumstances indicate fraud. *In re Morrow,* 2017 WL 2062859, at *5 (Bankr. D.N.M. 2017), citing *Bd. of Trustees v. Bucci (In re Bucci)*, 493 F.3d 635, 644 (6th Cir. 2007), and *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir.

---

[3] As discussed in *Bullock*, the definition of defalcation is unclear, and ranges from an innocent "failure to meet an obligation" to embezzlement. 569 U.S. at 261. As *Bullock* makes clear, defalcation as used in § 523(a)(4) does not include the innocent variety.

-5-

1988) (embezzlement consists of "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come").

    c. <u>Larceny</u>. Larceny is "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner." *Hernandez v. Musgrave (In re Musgrave)*, 2011 WL 312883, \*5 (10th Cir. BAP 2011) (quoting 4 Collier on Bankruptcy ¶ 523.10[2], 523-77 (16th ed. 2009)). Embezzlement differs from larceny in that "[e]mbezzled property is originally obtained in a lawful manner, while in larceny the property is unlawfully obtained." *Musgrave,* 2011 WL 312883, \*5.

  2. <u>Ownership of the funds at issue</u>. There is an initial problem with Plaintiff's § 523(a)(4) claim, because the money allegedly misused was not Plaintiff's money. Rather, it was the Corporation's money, and had been since August 7, 2012 (the initial $15,000 investment), or October 17, 2012 (the $5,000 investment). Defendant's initial handling of Plaintiff's investment funds was in accordance with Plaintiff's wishes. Much later, Defendant spent an unspecified amount of the Corporation's money on Defendant's personal expenses. Defendant never spent any of Plaintiff's money, either on Defendant's personal expenses or on anything else.

  3. <u>Plaintiff lacks standing to complain about alleged misuse of corporate assets</u>. Plaintiff, a stockholder of the Corporation, lacks standing to sue Defendant for misuse of corporate funds. *See Marchman v. NCNB Texas Nat. Bank,* 120 N.M. 74, 81 (S. Ct. 1995) (corporate shareholders do not have an individual right of action against a third person for damages resulting from an injury to the corporation). As stated in *In re Patel*, 536 B.R. 1, 16-17 (Bankr. D.N.M. 2015):

> [W]hen the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his [or her] corporate shares[,] ... it has been consistently held that the primary wrong is to the corporate body [.]" *Id.* (quoting *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d

727, 732 (3d Cir. 1970)). "Thus, although the stockholders of a corporation suffer when the corporation incurs a loss," they "should look to the recovery of the directly injured party, not the wrongdoer for relief." *Id.* (internal quotations omitted). *See also Clark v. Sims,* 147 N.M. 252, 254–55, 219 P.3d 20, 22–23 (Ct. App. 2009) ("*Marchman* applied the traditional rule and held that the shareholder in that case lacked individual standing to bring a direct action against third persons for damages resulting from an injury to the corporation, even though the shareholder was indirectly injured.").

Further, shareholders do not gain standing if they also are creditors. *See, e.g., Prudential-Bache Securities, Inc. v. Franz Mfg. Co.,* 531 A.2d 953, 955 (Super. Ct. Del. 1987) (creditor lacks standing to assert corporate claim against director for breach of duty); *Nobles v. Marcus,* 533 S.W.2d 923, 927 (Tex. 1976) (creditors do not have standing to assert legal rights belonging to the debtor corporation); *Valley View State Bank v. Owen*, 241 Kan. 343, 349 (S. Ct. 1987) (creditor of a corporation does not have standing to sue a custodian for alleged negligent loss of corporate assets).

      4.      <u>Fiduciary capacity</u>. Even if Plaintiff held sufficient legal standing, there is no evidence that Defendant acted in a "fiduciary capacity" toward Plaintiff as that term is used in § 523(a)(4). In the Tenth Circuit, to have § 523(a)(4) fiduciary duties, one must hold property of another pursuant to an express or technical trust. *In re Morrow*, 2017 WL 2062859, *5 (Bankr. D.N.M. 2017), citing *In re Young*, 91 F.3d 1367, 1371 (10th Cir. 1996). In New Mexico, shareholders in closely held corporations owe one another fiduciary duties similar to those owed among partners. *Walta v. Gallegos Law Firm*, 131 N.M. 544, 552-53 (Ct. App. 2002). Such duties, however, are not enough to trigger nondischargeable liability under § 523(a)(4). *See, e.g., Edward J. Horejs v. Robert M. Steele (In re Robert M. Steele)*, 292 B.R. 422, 427 (Bankr. D. Colo. 2003) (the statutory duty of good faith owed by a corporate director to shareholders is too general to create a technical trust under § 523(a)(4)). Here, there is no evidence that Plaintiff's $20,000

investment in Tango was held in an express or technical trust by Defendant, the Company, or the Corporation.

5. <u>No proof whose money was used to pay for Defendant's personal expenses</u>. Plaintiff has not shown that his $20,000 was spent on Defendant's personal expenses. Rather, the evidence shows that Plaintiff's $5,000 was deposited into the Corporation Account, which was never used to pay Defendant's personal expenses. Plaintiff's other $15,000 was deposited into the Company Account. Much later, Defendant apparently paid some of his personal expenses from this latter account. However, there is no evidence of what other funds were deposited into the Company Account, when they were deposited, or the amount and timing of any withdrawals. Without this information, the Court cannot determine if or when Plaintiff's $15,000, or some portion thereof, was spent.

6. <u>No proof how much was spent on personal expenses</u>. Finally, Plaintiff has not quantified the amount of the Corporation's money Defendant spent on personal expenses. Defendant testified that his personal expenses paid for with Corporation money were "minimal," but that general description was never quantified. Without that information, the Court could not determine a nondischargeable amount, even if the debt were otherwise nondischargeable.

For these reasons, the Court must rule against Plaintiff on his § 523(a)(4) claim.

C. <u>§ 523(a)(6) (Willful and Malicious Injury)</u>

1. <u>Elements of § 523(a)(6) claim</u>. Plaintiff also alleges that Defendant's debt is nondischargeable under 11 U.S.C. § 523(a)(6) because it arose from actions resulting in a "willful and malicious injury." To satisfy his burden under § 523(a)(6), a plaintiff must prove: (1) either he or his property sustained an injury; (2) the injury was caused by the debtor; (3) the debtor's actions were "willful;" and (4) the debtor's actions were "malicious." *In re Deerman*, 482 B.R.

344, 369 (Bankr. D.N.M. 2012). Nondischargeability under § 523(a)(6) requires that the debtor's actions be *both* willful and malicious. *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

To be willful, a debtor must have intended both the act and the resulting harm. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) ("The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."); *see also Deerman,* 482 B.R. at 369 (citing *Geiger*). For a debtor's actions to be malicious, they must be intentional, wrongful, and done without justification or excuse. *Deerman*, 482 B.R. at 369 (citing *Bombardier Capital, Inc. v. Tinkler*, 311 B.R. 869, 880 (Bankr. D. Colo. 2004)). The Tenth Circuit follows a subjective standard in determining whether a defendant desired to cause injury or believed the injury was substantially certain to occur. *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 2000 WL 1275614, at *3 (10th Cir. 2000) ("[T]he 'willful and malicious injury' exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur."); *Saturn Sys., Inc. v. Militare (In re Militare)*, 2011 WL 4625024, at *3 (Bankr. D. Colo. 2011) (citing *Tinkler*, 311 B.R. at 878).

Knowing or intentional conduct is not enough to trigger § 523(a)(6) liability; the plaintiff must also show that the defendant intended to do harm. *See, e.g., In re Osborne,* 520 B.R. 861, 873 (Bankr. D.N.M. 2014) (denying plaintiff's § 523(a)(6) claim because, while defendant intentionally concealed property encumbrances, there was no evidence that defendant intended harm or acted with malice); *Humility of Mary Health v. Garritano (In re Garritano)*, 427 B.R. 602, 613 (Bankr. N.D. Ohio 2009) (to the same effect).

2. <u>Injury to person or property</u>. Plaintiff does not allege that he suffered a personal injury, but his claim could be construed as an injury to his property (i.e., his $20,000 investment). Not every loss of money, however, comes within § 523(a)(6). As stated in *In re Cagan*, 2010 WL 3853316 (Bankr. D.N.M. 2010):

> Conversion of a creditor's property interest can support a non-dischargeability claim under 11 U.S.C. § 523(a)(6) (citations omitted). As explained by the Supreme Court in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), decided under subsection (6) of § 17(a) of the Bankruptcy Act of 1898, the precursor to 11 U.S.C. § 523(a)(6),
>
>> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception . . . But a willful and malicious injury does not follow as a matter of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice.
>
> 293 U.S. at 332 (citations omitted).

2010 WL 3853316, at *3. *See also In re Tinkler*, 311 B.R. 869, 878 (Bankr. D. Colo. 2004).

2. <u>Willfulness</u>. To be willful, Defendant must have intended both the act and the resulting harm. There is no evidence that Defendant intended to harm Plaintiff when Defendant paid for some of his personal expenses with corporate money. Rather, the evidence shows that Defendant was trying to make Tango a success, was working hard on the business with very little income, and spent corporate money because he had no other source of funds.

3. <u>Malice</u>. Similarly, Plaintiff has not demonstrated that Defendant acted with malice. There is no evidence that Defendant desired to injure Plaintiff or believed that injury was substantially certain to occur.

For these reasons, the Court finds against Plaintiff on his § 523(a)(6) count.

-10-

Case 17-01006-t    Doc 21    Filed 09/19/17    Entered 09/19/17 16:50:31 Page 10 of 11

III.  CONCLUSION

Plaintiff has a valid claim against the Defendant, and the Court understands Plaintiff's displeasure with the results of his investment.  Further, Plaintiff, who proceeded in this matter pro se, did a creditable job at trial of this matter.  Ultimately, however, the facts in evidence and the strict law on nondischargeability compel the result.  Defendant's obligation to Plaintiff is dischargeable.  The Court will enter a separate judgment.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: September 19, 2017

Copies to:

Charles J. Davis
20 Apple Blossom Ln.
Corrales, NM 87048

Michael Adam Arellano
224 Nico Trail NW
Albuquerque, NM 87114